# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                                    :
                          Appellant            :
                                               :
            v.                                 :
                                               :
Penn Township Zoning Hearing Board   :    No. 1632 C.D. 2018
                                               :    Argued:  October 3, 2019
            v.                                 :
                                               :
Olympus Energy LLC,                            :
Apex Energy (PA), LLC, and                     :
The Township of Penn                           :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ROBERT SIMPSON, Senior Judge


**OPINION**
**BY SENIOR JUDGE SIMPSON**              **FILED:  November 14, 2019**

## I. Introduction

In this land use case, Protect PT appeals an order of the Court of Common Pleas of Westmoreland County (trial court)[1] that, after holding an extended hearing and receiving a large volume of evidence, denied Protect PT's substantive validity challenge to Penn Township's (Township) Ordinance No. 912-2016 Chapter 190 (Zoning), as amended (Zoning Ordinance).  Notably, the Zoning Ordinance established five unique zoning districts and four overlay districts in the Township. In particular, the Zoning Ordinance established a Rural Resource (Resource) District and a Mineral Extraction Overlay (MEO) District.  Protect PT specifically

---

[1] The Honorable Harry F. Smail, Jr., presided.

challenged the constitutionality of the MEO District to the extent it permits unconventional natural gas development (UNGD) in the Resource District, which also permits low-density residential properties.

Protect PT contends the Township's Resource District is essentially a growing suburban community and that UNGD is a heavy industrial activity incompatible with residential use and preservation of the environment. In rejecting Protect PT's contentions, the trial court determined the Zoning Ordinance does not violate either the substantive due process rights of the Township's residents or their rights under the Environmental Rights Amendment (ERA) in Article I, Section 27 of the Pennsylvania Constitution.[2] Therefore, the trial court held the Zoning Ordinance constitutionally valid.

More specifically, Protect PT asserts on appeal that the trial court erred or abused its discretion: (1) in failing to consider all phases of developing an UNGD well pad prior to the production phase in analyzing the validity of the Zoning Ordinance even though the drilling and completion phases continue indefinitely; (2) in failing to find that UNGD is a heavy industrial activity associated with impacts on neighboring residents similar to other heavy industrial activities including air pollution, water pollution, traffic congestion, noise, light and threats to public safety; (3) in finding that UNGD historically took place in the Township and is compatible with the Township's Comprehensive Plan and the agricultural and residential land uses authorized in the Resource District; (4) in finding the MEO District is an appropriate use of a zoning overlay even though it fails to impose specific and

---

[2] PA. CONST. art. I, §27.

targeted provisions tailored to local conditions without disturbing expectations created by the underlying district; (5) in finding that the enactment of the Zoning Ordinance did not violate the ERA where the Township Board of Commissioners (Commissioners) failed to account for the impact of UNGD on Township citizens' rights to clean air, pure water and the natural, scenic, historic, and esthetic values of the environment; and (6) in finding the Zoning Ordinance does not violate the substantive due process rights of Township citizens even though Protect PT demonstrated the Zoning Ordinance is arbitrary and unreasonable, and lacks any substantial relationship to promoting the public health, safety and welfare.

The present case raises similar issues to those recently addressed by this Court in Frederick v. Allegheny Township Zoning Hearing Board, 196 A.3d 677 (Pa. Cmwlth. 2018) (*en banc*), appeal denied, 208 A.3d 462 (Pa. 2019) (holding objectors failed to establish that UNGD was incompatible with other uses or that the ordinance violated substantive due process or the ERA), and Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board (Delaware Riverkeeper (Middlesex) (Pa. Cmwlth., No. 2609 C.D. 2015, filed June 26, 2019), 2019 WL 2605850 (unreported),[3] (applying Frederick and denying the objectors' substantive validity and ERA challenges to a zoning ordinance allowing UNGD as a permitted use in a residential agricultural district). In light of our decisions in Frederick, Delaware Riverkeeper (Middlesex) and other applicable cases, we affirm the trial court's order denying Protect PT's challenges to the Zoning Ordinance.

---

[3] Unreported cases, issued after January 15, 2008, may be cited for their persuasive value. See Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

## II. Background

## A. Substantive Validity Challenge to Zoning Ordinance

In September 2016, the Commissioners enacted the Zoning Ordinance, which created five unique zoning districts in the Township. In addition to the Resource District, the Ordinance established the Mixed Density Residential District, the Neighborhood Commercial District, the Commercial Corridor District, and the Industrial Corridor District. The Ordinance also created four overlay districts. In addition to the MEO District, they include the Airport Overlay District, the Floodplain Overlay District and the Development Infill Overlay District. The MEO District, which permits UNGD, overlays the Industrial Commercial District (IC District) and the majority of the Resource District, with the exception of the densely populated Claridge area.

In April 2017, Protect PT, proceeding before the Township's Zoning Hearing Board (ZHB), filed a notice of substantive validity challenge under Section 916.1 of the Pennsylvania Municipalities Planning Code (MPC).[4] In particular, Protect PT challenged the constitutionality of the MEO District. In June 2017, the ZHB issued a letter stating it did not intend to schedule a public hearing on Protect PT's validity challenge. This resulted in a deemed denial under the MPC.

In July 2017, Protect PT appealed the deemed denial to the trial court. Huntley & Huntley Energy Exploration, LLC (Huntley), an oil and gas exploration and production company operating in the Township, and Apex Energy of

---

[4] Act of July 31, 1968, P.L. 805, as amended, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10916.1.

4

Pennsylvania, LLC (Apex), an oil and gas company focused on UNGD, which also operates in the Township, were permitted to intervene. The Township also intervened in the appeal.[5]

## B. Trial: General Overview

Where, as here, the trial court takes evidence on the merits, it must review the case *de novo*. Coal Gas Recovery, L.P. v. Franklin Twp. Zoning Hearing Bd., Greene Cty., 944 A.2d 832 (Pa. Cmwlth. 2008). This Court then reviews the trial court's findings of fact and legal conclusions for errors of law or an abuse of discretion. Id. An abuse of discretion occurs where the trial court's findings are not supported by substantial evidence. Id. Substantial evidence is such relevant evidence that a reasonable mind would accept as adequate to support a conclusion. Id.

Here, the trial court conducted a *de novo* trial and took evidence over four days in April and June 2018. During those proceedings, the trial court heard testimony from 21 witnesses, and admitted 93 exhibits into evidence. The parties also submitted briefs and proposed findings of fact.

In November 2018, the trial court issued a comprehensive opinion and order denying Protect PT's substantive validity challenge and holding the Zoning Ordinance constitutionally valid. In its findings of fact, the trial court noted that the Zoning Ordinance described the purpose of the Resource District as providing land

---

[5] By order dated October 15, 2019, we granted an application by Huntley & Huntley Energy Exploration, LLC (Huntley) to amend the caption to reflect its new name, Olympus Energy, LLC. However, to avoid confusion regarding the briefs, record and prior decisions involved in this appeal, we will refer to this party as Huntley in this opinion.

for continuing agricultural operations, resource management, timber harvesting, outdoor recreation, public and private conservation areas, low density single family residential, and compatible support uses. Ord. §190-402(A). The court further noted the purpose of the MEO District is described as providing areas for the extraction of minerals where the population density is low and significant development is not projected for the near future. Ord. §190-407(A). Mining and conventional oil and natural gas drilling are listed as principal uses in the MEO District. *Unconventional* oil and natural gas drilling are listed as special exceptions. Ord. §§190-407(C), 190-407(D).

The trial court also recognized that UNGD is subject to numerous standards, including general development standards in the Zoning Ordinance and particular standards pertaining to the MEO District. To that end, the trial court noted:

> Requirements include but are not limited to a prohibition on wastewater impound storage, dumping and seepage, regular removal of wastewater and hazardous and/or toxic waste, compliance with the Township's Subdivision and Land Development Ordinance, acquisition of relevant Pennsylvania Department of Environmental Protection ('DEP') permits, and a minimum lot size of [10] acres, as well as a [600] foot 'protected structure' setback and a 200 foot property line setback. [Ord.] §190-407(G). As [UNGD] is a special exception, the [ZHB] also has the right to impose additional conditions on the grant of the exception for purposes of promoting the health, safety and welfare of the Township's residents. [Trial Transcript pp.] 744-45).
>
> Section 641(D) requires that the developer of a proposed UNGD well specifically 'demonstrate that the drill site operations will not violate the [Township citizens'] right to clean air and pure water as set forth in the [ERA] through the

6

submission of reports from 'qualified environmental individuals' stating that the proposed drilling will not negatively impact these rights. [Ord.] §190-641(D). Specifically required are 'air modeling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.' [Ord.] §190-641(D).

Tr. Ct., slip op., 11/9/18, at 3-4 (emphasis added). The trial court also noted the subject of UNGD in the Zoning Ordinance was addressed at 19 Planning Commission meetings, 53 Commissioners' meetings, 2 public meetings and a town hall meeting at which Protect PT presented 7 speakers, including its executive director. Id. at 4.

**C. Protect PT's Expert Witnesses**

At trial, Protect PT presented testimony from three expert witnesses. Anthony Ingraffea, Ph.D. (Dr. Ingraffea) is an engineer and co-founder of Physicians, Scientists and Engineers for Healthy Energy (PSE). Ultimately, the trial court rejected Dr. Ingraffea's opinion that UNGD causes significant adverse impacts to air and water quality, community development, human-induced seismicity, climate change, and animal health. The trial court also rejected Dr. Ingraffea's opinion that UNGD is a heavy industrial activity. These credibility findings are material to our analysis.

Protect PT also presented testimony from Edward C. Ketyer, M.D. (Dr. Ketyer), a pediatrician in Washington County, and a consultant with the Southwest Pennsylvania Environmental Health Project, which solicits patients who believe they may have health symptoms as a result of oil and gas development. Dr. Ketyer is also a board member of Physicians for Social Responsibility, whose goal is to develop a fossil fuel free world. Ultimately, the trial court rejected Dr. Ketyer's

7

opinion that emissions from UNGD presently pose a threat to human health. This credibility finding is also significant to our analysis.

Protect PT's third expert, Thomas Daniels, Ph.D. (Professor Daniels), is a professor of city and regional planning at the University of Pennsylvania. Professor Daniels testified regarding the Township's Comprehensive Plan. He noted that the MPC requires the reasonable development of minerals and gas. However, Professor Daniels opined that he considers UNGD to be a heavy industrial use and that the MEO District does not fulfill the purpose of the Comprehensive Plan because the Resource District is predominantly residential. He further stated that the MEO District as it exists resulted in a scattered pattern of wells with heavy truck traffic and inconvenience to the Township's residents. However, the trial court declined to adopt Professor Daniels' opinions that UNGD is a heavy industrial use that is incompatible with the Comprehensive Plan and agricultural areas in general. These credibility findings also impact our analysis.

### D. Intervenor Huntley's Expert Witnesses

In response, Intervenor Huntley, an oil and gas exploration and production company operating in the Township, presented testimony from three experts. Huntley presented Samuel A. Flewelling, Ph.D. (Dr. Flewelling), an environmental science consultant and a member of the Geophysical Union and the Geological Society of America. Dr. Flewelling has extensive experience regarding the impact of hydraulic fracturing on groundwater and general matters of hydrogeology. Dr. Flewelling opined that both conventional and unconventional oil and gas development have an extensive history in Westmoreland County, dating back

over a hundred years. Between 1980 and 2017, approximately 5,380 conventional and 252 unconventional wells have been drilled in the county. Unconventional wells are more compact and produce more gas than conventional wells.

Dr. Flewelling stated that the risks of gas leaks into the drinking water are unlikely due to DEP casing and cementing requirements. Dr. Flewelling further indicated that contamination to drinking water is not likely through the deep hydraulically fractured rock as the fractures are normally lower than the aquifer. In addition, a low permeability layer creates a barrier, and there is no force driving the fluid upward. Important to our analysis, the trial court adopted Dr. Flewelling's above-expressed opinions regarding groundwater and hydrogeology.

Intervenor Huntley also presented expert testimony from Dr. Christopher Long (Dr. Long), who holds a doctoral degree in environmental health from Harvard University's School of Public Health. Dr. Long is a certified toxicologist. He routinely conducts human health risk assessments, and he has experience studying the air quality impacts and risks caused by UNGD. Without objection, the trial court qualified Dr. Long as an expert in toxicology, air emission exposure assessment and human health risk assessment.

Dr. Long testified that all air emissions associated with all phases of UNGD, excepting production, are transient and short-term. Various air pollutants associated with UNGD are ubiquitous in everyday life, such as fine particulate matter (FPM). Most persons are regularly exposed to the same on a short-term basis

9

from everyday activities. A large amount of air monitoring now occurs in the Marcellus Shale region near gas development and is conducted by various groups.

Dr. Long further testified that DEP monitored FPM in Greene, Bradford and Tioga Counties with no findings of elevated FPM levels. Also, monitors in Bradford, Tioga and Washington Counties found nitrogen dioxide levels far below the relevant national standard. Further, DEP monitors near UNGD in Washington, Wyoming and Susquehanna Counties all reported average benzene levels. In addition, the Allegheny County Health Department, which placed monitors for volatile organic compounds (VOC) near well pad activity, found VOC levels far below levels of concern for human health. Based on these and other VOC studies related to UNGD in Pennsylvania, the trial court adopted Dr. Long's expert opinions regarding toxicology, air emission exposure assessment and human health risk assessment. This credibility determination is material to our analysis. It is within the exclusive province of the trial court, as the fact-finder in a zoning case, to resolve all matters of witness credibility and evidentiary weight. See Penn St., L.P. v. E. Lampeter Twp. Zoning Hearing Bd., 84 A.3d 1114 (Pa. Cmwlth. 2014).

As its third expert witness, Intervenor Huntley presented Professor Ross Pifer (Professor Pifer), a professor at the Penn State School of Law. Professor Pifer is the director of the Center for Agriculture and Shale Law and Rural Economic Development Clinic. Professor Pifer, who also testified in Frederick, visited numerous UNGD sites during various stages of development. He focused his research on the interplay between UNGD and the community, especially in agricultural areas. Professor Pifer made over 300 presentations regarding oil and

gas development in the past 10 years. His expert testimony regarding the compatibility of oil and gas with rural and agricultural communities has been accepted by zoning hearing boards in Westmoreland, Lawrence and Washington Counties.

Professor Pifer further testified that UNGD primarily takes place in rural and semi-rural counties in the Commonwealth, and that Westmoreland County ranks ninth in the state for UNGD, with 283 wells already drilled. UNGD, in existence since 1947, provides more benefit to agricultural regions than conventional drilling. UNGD has less surface impact and can access more acreage.

Professor Pifer identified approximately 100 municipalities in Pennsylvania, some with zoning and some without, where UNGD, single-family homes, and agricultural uses coexist. In Westmoreland County, 24 municipalities have no zoning ordinances and allow UNGD throughout the entire municipality.

Professor Pifer further noted that Pennsylvania law explicitly encourages the coexistence of oil and gas development and agriculture through protections provided in the Pennsylvania Farmland and Forest Land Assessment Act of 1974, popularly known as the Clean and Green Act,[6] and the Agricultural Area Security Law (AASL),[7] which involve many farmers in the Township. The Clean and Green Act also recognizes that the financial benefits of UNGD from gas leasing enables farmers to maintain agricultural operations on their land throughout generations of farmers. This permits rural lands to remain rural and prevents the

---

[6] Act of December 19, 1974, as amended, 72 P.S. §§5490.1-5490.13.

[7] Act of June 30, 1981, P.L. 128, as amended, 3 P.S. §§901-915.

11

forced sale of farmlands to commercial or residential development. Ultimately, the trial court adopted Professor Pifer's opinion that UNGD is compatible with agricultural and rural land uses, both generally and as laid out in the MEO District under the Zoning Ordinance. See Tr. Ct., slip op., 11/9/18, at 12. This credibility finding is also critical to our analysis.

Intervenor Huntley also presented testimony from Jason Paul Gehringer (Analyst Gehringer), a primary Geographic Information System analyst. He testified to the existence of the Oakford Storage Field, a mostly depleted natural gas reservoir that lies beneath one-quarter of the Township's land mass. Analyst Gehringer calculated that upon taking into consideration all setbacks and regulatory requirements imposed by the Zoning Ordinance, only 9.46% of the Township's land mass is available for UNGD.

**E. Apex Witness**

Intervenor Apex presented testimony from Christopher James Hess (Hess), its general counsel, vice president of land development and corporate secretary. Hess oversees regulatory compliance, leasing and land functions. Apex leases about 7,509 acres and maintains exclusive rights to drill in the Marcellus Shale beneath the Oakford Storage Field in the Township. Apex received approval to develop the Quest UNGD well pad, which is now in production. Apex has seven other well pads planned in the Township.

Hess testified regarding the steps of development in UNGD, including leasing, design, permitting and construction. He described the measures taken by

12

Apex to prevent spills and releases at the site. Apex entered into an agreement with Westmoreland County to obtain water through municipal taps, thereby eliminating about 3,000 water trips per well. He also described DEP well permit requirements for protecting surrounding water sources and DEP permit requirements for surface disturbance and mitigation.

In sum, Hess testified that during the production phase, UNGD generates no light at the well site, and no noise audible at the property line. Truck traffic during the production phase is limited to two truck trips per day and a few waste-water truck visits per month. Hess noted that Apex has not received any noise, light or traffic complaints regarding the Quest well site since it entered the production phase.

## F. Lay Witnesses

Protect PT presented lay testimony from its executive director, Gillian Graber (Graber). She described Protect PT's mission as the protection of Township residents in the Penn-Trafford area from the effects of UNGD. Protect PT members often engage in special exception hearings, meetings and other public forums. Graber testified that Protect PT has also placed noise and air quality monitors at residences around the Township at property owners' requests.

Protect PT also presented lay testimony from eight additional members or property owners living near proposed well sites in the Township. They expressed concerns regarding noise, light and air emissions, truck traffic, adverse effects on

13

groundwater and water pressure, adverse effects on property values, and other health and safety issues.

Conversely, Intervenor Huntley presented lay testimony from Richard J. Hajnosz and Adam Ferri (Ferri), two property owners who rely on UNGD lease and royalty payments to maintain their agricultural property and to avoid selling it for residential development. Ferri, a real estate developer who owns a 133-acre tract in the Resource District, testified residential development negatively impacts the agricultural nature of the property in the Resource District. Ferri testified that permanent impacts from residential development include traffic and impervious surface loss. See Notes of Testimony (N.T.), 6/4/18, at 844-45; Reproduced Record (R.R.) at 722a.

### G. Trial Court's Discussion and Analysis
### 1. Generally

As discussed above, when reviewing a challenge to a zoning ordinance in which it takes evidence, the trial court performs a *de novo* review. Coal Gas Recovery Grp. Because a zoning ordinance is presumed valid, a challenger bears a heavy burden of establishing its invalidity. Woll v. Monaghan Twp., 948 A.2d 933 (Pa. Cmwlth. 2008). A validity challenge generally attacks zoning on substantive due process grounds, *i.e.*, whether an ordinance is substantially related to a legitimate interest. Plaxton v. Lycoming Cty. Zoning Hearing Bd., 986 A.2d 199 (Pa. Cmwlth. 2009). Where the validity of an ordinance is debatable, it must be upheld. Main Street Dev. Grp., Inc. v. Tinicum Twp. Bd. of Supervisors, 19 A.3d 21 (Pa. Cmwlth. 2011).

14

In Pennsylvania, the constitutionality of a zoning ordinance is reviewed under a substantive due process analysis. Plaxton. Under such analysis, the party challenging the validity of the provisions of a zoning ordinance must establish that the challenged provisions are arbitrary or unreasonable and have no substantial relationship to promoting the public health, safety and welfare. Id. In examining whether the ordinance is a valid exercise of the police powers, reviewing courts must balance the public interest to be served by the ordinance against the confiscatory or exclusionary impact of the ordinance on individual rights. Delchester Developers, L.P. v. Zoning Hearing Bd. of London Grove, 161 A.3d 1081 (Pa. Cmwlth. 2017); Penn St.

Protect PT alleged the MEO District violates the Township residents' substantive due process rights, as well as their constitutional rights under the ERA in Article I, Section 27 of the Pennsylvania Constitution, by allowing UNGD in the Resource District. Protect PT alleged the Resource District is primarily residential. Protect PT claimed the MEO District is designed in such a way that UNGD is able to be developed in a haphazard manner, creating nuisances and health risks for neighboring property owners. Thus, Protect PT maintains the MEO District is invalid.

**2. Substantive Due Process**

Protect PT first argued that in enacting the Zoning Ordinance, the Township failed to consider the effects of UNGD on neighboring property owners. Protect PT maintained that UNGD is a heavy industrial use, and that allowing UNGD, in what Protect PT perceives as a majority of the Township, creates

15

nuisance, health and safety risks for neighboring property owners in the Resource District, thereby violating their substantive due process rights.

The trial court recognized UNGD is a lawful and not a disfavored use in Pennsylvania. Section 603(i) of the MPC states: "Zoning ordinances shall provide for the reasonable development of minerals in each municipality." 53 P.S. §10603(i). An integral purpose of the Resource District is resource management. See Ord. §190-402(A). Section 107(a) of the MPC defines "minerals" as including "crude oil and natural gas." 53 P.S. §10107(a). Notably, our Supreme Court determined that pursuant to Section 601 of the MPC, the governing body of a municipality may amend its zoning ordinances to permit oil and gas development in any or all of its zoning districts. Gorsline v. Bd. of Supervisors of Fairfield Twp. (Gorsline II), 186 A.3d 375 (Pa. 2018).

Here, the trial court observed that the Township carefully balanced its obligation to provide for the management and development of minerals with the inherent rights of the neighboring property owners in the MEO District.

The trial court further noted that under Pennsylvania law, zoning regulates only the *use* of the land, not the particulars of development and construction. Frederick; Gorsline v. Bd. of Supervisors of Fairfield Twp. (Gorsline I), 123 A.3d 1142 (Pa. Cmwlth. 2015), rev'd on other grounds, 186 A.3d 375 (Pa. 2018); Schatz v. New Britain Twp. Zoning Hearing Bd. of Adjustment, 596 A.2d 294 (Pa. Cmwlth. 1991). Therefore, the trial court reasoned, the development and construction of a well pad prior to its production phase or *use* phase, should not be

taken into account in analyzing the zoning ordinance in a validity challenge. Similarly, it would be improper to assess the industrial activities that take place during the construction of any commercial or residential property, prior to the structures being used.

### 3. Compatibility with Resource District

As Professor Pifer explained, a producing UNGD well pad is entirely compatible with the purpose of the Resource District, which provides for resource management and agricultural operations. In fact, UNGD can be beneficial to agricultural uses. Huntley's two lay witnesses, Ferri and Hajnosz, testified that the financial benefits of UNGD on their respective properties helps them preserve the agricultural nature of their land by promoting inter-generational farm transfers and allowing for the continuance of farming activity that might not be feasible otherwise.

### 4. Environmental & Health Concerns

With respect to Protect PT's environmental and health concerns, the trial court rejected the opinions of Protect PT's experts, Dr. Ingraffea and Dr. Ketyer, regarding the actual risks to Township residents. The trial court found their testimony speculative and not indicative of any substantial environmental or health risks.

The trial court found credible the testimony of Intervenor Huntley's expert witnesses, Dr. Long and Dr. Flewelling. Dr. Long presented significant amounts of actual air monitoring data showing no danger to public health related to widespread air emissions caused by UNGD. The trial court also credited the

17

testimony of Dr. Flewelling regarding the low risk of water contamination by UNGD and the abundant water protections already in place.

The trial court also expressed sympathy for the landowners' worries regarding the hypothetical diminution of property values, increases in noise and light, and other stated concerns. Nonetheless, the trial court noted that the Township adequately considered these concerns as part of an extensive balancing inquiry in adopting the Zoning Ordinance, which is far more protective of Township citizens than the previous zoning ordinance.

Further, the trial court rejected Protect PT's argument that the MEO District allows for UNGD in the majority of the Township's residential areas. The court noted the Township made a great effort to develop and refine the Zoning Ordinance to provide for UNGD only in specifically delineated areas. In considering the setbacks and other required considerations, UNGD can take place in approximately 9.46% of the Township. Given the Township's thorough analysis of the particulars of oil and gas development evidenced by the Zoning Ordinance's many drafts and revisions, and the countless public meetings from 2010 through 2016, the trial court determined that the Zoning Ordinance provides for an exceedingly heightened level of protection for neighboring property owners.

In concluding its substantive evidence analysis, the trial court recognized it must balance the public interest to be served by the Zoning Ordinance against the confiscatory or exclusionary impact on individual property rights. Delchester. The trial court found the Township carefully considered and balanced

18

the Township's residents' rights concerning their health and safety with the interests of neighboring landowners who rely on royalties and lease payments from UNGD to maintain the agricultural use of their property. In enacting the Zoning Ordinance, the Township established a series of rigorous requirements ensuring that UNGD in the Township complies with all state and federal mandates.

The Zoning Ordinance also imposed additional protections in the form of setbacks, acreage requirements, an exclusion of the most densely populated area of the Resource District, and the requirement that developers submit reports to the Township expressly representing that UNGD will not impact the residents' rights under the ERA. Based on the evidence presented, the trial court concluded that the Township fully considered the public health, safety and welfare of Township residents in enacting the Zoning Ordinance.

Summarizing, the trial court recognized that a determination of whether legislation is wise or whether it is the best means to achieve the desired result is best left to the governing body and not the courts. The governing body is presumed to have investigated the question and ascertained what is best for the good of the people. Khan v. State Bd. of Auctioneer Exam'rs, 842 A.2d 936 (Pa. 2004). Thus, the trial court reasoned, even if it was to disagree with the substance of the Zoning Ordinance, it is apparent that the Township exercised due diligence in ascertaining what it believed to be the best balance of protections for all its residents. Consequently, the trial court determined Protect PT did not meet its heavy burden of showing that the presumptively valid Zoning Ordinance is arbitrary and

19

unreasonable, or that it has no substantial relationship to promoting the public health, safety and welfare. Plaxton.

## 5. Robinson Township Cases; Gorsline II

Next, Protect PT cited Robinson Township, Washington County v. Commonwealth (Robinson II), 83 A.3d 901 (Pa. 2013), where the Supreme Court deemed several provisions of the amended Pennsylvania Oil and Gas Act (Oil and Gas Act)[8] unconstitutional because they allowed for UNGD as of right in all areas of the Commonwealth, entirely preempting local zoning in the matter of oil and gas regulation. The trial court observed that the circumstances in Robinson II are entirely different from those in the present case. Rather, the situation in the present case is the situation that Robinson II intended to protect: a municipality making its own decisions regarding oil and gas regulation, uniquely tailored to local circumstances, and mindful of Pennsylvania citizens' constitutional rights. The trial court further noted that in Robinson Township, Washington County v. Commonwealth (Robinson IV), 147 A.3d 536 (Pa. 2016), the Supreme Court went out of its way to express the importance of locally tailored policy goals and the importance of considering local conditions and the needs of the residents in assessing oil and gas development at a municipal level.

The trial court also found our Supreme Court's decision in Gorsline II distinguishable from the present case. The relevant ordinance in Gorsline II delineated a residential-agricultural zoning district, in which UNGD was neither specifically allowed nor prohibited. The ordinance included a savings clause,

---

[8] 58 Pa. C.S. §§2301-3504.

20

wherein a use could be allowed if shown to be similar to other uses permitted in that zoning district. Ultimately, in Gorsline II our Supreme Court reversed this Court's decision in Gorsline I holding that UNGD was similar to other uses in the district, specifically public service facilities and essential services.

Unlike the zoning ordinance at issue in Gorsline II, the trial court observed that here the Zoning Ordinance does not require a showing that UNGD is similar to public service facilities or any other uses permitted in the zoning district. Rather, under the Zoning Ordinance, UNGD is permitted in the MEO District as a special exception.

In particular, the trial court noted that the Supreme Court in Gorsline II emphasized that its decision should not be misconstrued as an indication that oil and gas development is never permitted in residential or agricultural districts, or that it is fundamentally incompatible with residential or agricultural uses. The Supreme Court also highlighted the importance of local municipalities tailoring ordinances to the particulars of local conditions in order to protect environmental values. In order to permit UNGD, a local government body must "actually amend its zoning ordinances to permit drilling in designated areas, setting forth whatever limitations and conditions it decides are appropriate for the protection of its citizenry." Gorsline II, 186 A.3d at 389. The trial court observed that this is precisely what occurred in the present case. The Township spent many years receiving input from various sources, including members and representatives of Protect PT. The Township then crafted an ordinance setting forth protective limitations and conditions.

21

**6. Comprehensive Plan; Property Owner Expectations**

In addition, Protect PT argued the MEO District directly contradicts the Township's community planning tools and directly conflicts with the purpose of the underlying districts. Protect PT alleged the MEO District disrupted the reasonable expectations of property owners in the Resource District. In rejecting Protect PT's contentions, the trial court recognized that the Township's Comprehensive Plan promotes both growing residential development and agricultural use. As noted above, the trial court credited Professor Pifer's testimony that UNGD and agricultural uses are inherently compatible. Therefore, the trial court decided the MEO District fits plainly within the goals of the Comprehensive Plan.

Further, even assuming the MEO District was incompatible with the Comprehensive Plan, Section 303(c) of the MPC provides that no action by the governing body of a municipality shall be invalid or be subject to challenge on appeal on the basis that such action is inconsistent with, or fails to comply with, the provisions of a comprehensive plan. 53 P.S. §10303(c).

With respect to the property owners' expectations, the trial court found that Protect PT failed to present any testimony from landowners indicating that they investigated the zoning ordinance in effect at the time of their purchase. In any case, even if a landowner purchased the property prior to the enactment of the Zoning Ordinance, the purchaser would have been afforded much less protection under the regulation of UNGD under prior ordinances, which were much less restrictive. Consequently, the trial court concluded that Protect PT cannot meet its heavy burden

of proof in a challenge to the MEO District as being in violation of the Comprehensive Plan or property owners' expectations.

### 7. Appropriate Use of Overlay District

Protect PT also argued that the MEO District violates established standards for the appropriate use of an overlay district in zoning. "An overlay district creates a framework for conservation or development allowing for a new type of development or imposing restrictions that is superimposed over the zoning districts on all or part of a municipality." Main St., 19 A.3d at 28. "The purpose of an overlay district is to create specific and targeted provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning ordinance." Id. "In other words, overlay districts supplement existing zoning districts, they do not supersede them either in fact or in practice." Id.

Here, the trial court found the MEO District to be an appropriate use of the overlay district concept. The MEO District succeeded in creating specific and targeted provisions allowing for limited UNGD in sparsely populated areas without being overly burdensome or conflicting with the expectations of property owners in the Resource District. Thus, the trial court rejected Protect PT's claims that the MEO District disturbs the reasonable expectations of property owners in the Resource District.

## 8. ERA; Constitutionality

In its final substantive argument before the trial court, Protect PT asserted that the Township failed to fulfill its fiduciary obligation to protect its residents' environmental rights under Article I, Section 27 of the Pennsylvania Constitution, known as the ERA, which provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, §27.

The trial court observed that Protect PT's constitutional challenge under the ERA largely mirrored its substantive due process argument. Protect PT cited our Supreme Court's decision in Pennsylvania Environmental Defense Foundation v. Commonwealth (PEDF), 161 A.3d 911 (Pa. 2017), for the proposition that "the Commonwealth has a duty to prevent the degradation, diminution, and depletion of our public natural resources, whether these harms might result from direct state action or from the actions of private parties." Id. at 933.

In rejecting Protect PT's argument, the trial court reasoned that the Township took into account the ERA's mandate. Pursuant to Section 190-641(D) of the Zoning Ordinance, the Township placed the burden on every UNGD developer to demonstrate that drill site operations will not violate Township's citizens' rights to clean air and clean water through the reports of qualified environmental individuals.

24

These reports must state that the proposed drilling will not negatively impact ERA rights.

Overall, the trial court noted, the Zoning Ordinance offers Township citizens more protections with regard to UNGD than many municipalities throughout the county and the Commonwealth. The trial court reasoned that to find the Zoning Ordinance in violation of the ERA would directly bring into question the constitutional compliance of every municipality in the Commonwealth which chooses to not enact zoning regulations, or which chooses to enact some less stringent regulation of oil and gas activity.

### 9. Frederick

The trial court found this Court's decision in Frederick particularly relevant to the present case. In Frederick, an *en banc* panel of this Court affirmed a decision of a zoning hearing board upholding UNGD, as a permitted use *by right*, in all of the township's zoning districts. In early 2015, the township's zoning hearing board conducted a hearing on a validity challenge raising substantive due process and ERA-based challenges similar to those raised by Protect PT in the present case. The zoning hearing board found oil and gas development to be consistent with rural and agricultural uses. Thus, the zoning hearing board rejected the objectors' ERA and substantive due process challenges. Notably, the zoning hearing board accepted and relied upon the opinions provided by Professor Pifer, which largely track the opinions he provided in the present case.

Here, the trial court focused on this Court's unequivocal holdings in Frederick that the township zoning ordinance did not violate either the objectors' substantive due process rights or their rights under the ERA. Ultimately, the trial court determined that it would be contrary to current precedent to conclude the Zoning Ordinance, a more stringent ordinance than the zoning ordinance in Frederick, violates either substantive due process or the ERA.

For these reasons, the trial court held that the Zoning Ordinance does not violate the substantive due process rights of the Township's residents or their rights under the ERA. Protect PT appeals.[9]

### III. Discussion
### A. Pre-Production Phases of UNGD; Heavy Industrial Activity
### 1. Contentions
### a. Consideration of Pre-Production Phases of UNGD

Protect PT first contends the trial court erred or abused its discretion in failing to consider all phases of developing an UNGD well pad prior to the production phase in analyzing the validity of the Zoning Ordinance even though the drilling and completion phases are ongoing indefinitely. Therefore, Protect PT further asserts the trial court erred or abused its discretion in failing to find that UNGD is a heavy industrial activity associated with impacts on neighboring residents similar to other heavy industrial activities including air pollution, water pollution, traffic congestion, noise, light and threats to public safety.

---

[9] Where, as here, the trial court takes additional evidence, our review is limited to determining whether the trial court abused its discretion or erred as a matter of law. Larock v. Bd. of Supervisors of Sugarloaf Twp., 961 A.2d 916 (Pa. Cmwlth. 2008).

Protect PT argues that all phases of development or construction prior to the final production phase should be taken into account in analyzing the Zoning Ordinance. Protect PT asserts that the most impactful phases of development, drilling and completion may be repeated many times during the life of a well pad. The average number of wells on a well pad is five. However, Protect PT claims there are many pads in the U.S. that have 20 or more wells. Therefore, Protect PT maintains that the excavation and construction, drilling and fracking/completion phases are as much a part of the use of the land as the final production phase.

In support of its position, Protect PT asserts that courts have traditionally evaluated the drilling and fracking phases of UNGD as part of any applicable zoning analysis. In Gorsline II, the Supreme Court stated a proposed well pad is a purely industrial use of the type discouraged in the township's residential-agricultural district. In Robinson II, the Supreme Court, in ruling part of the Oil and Gas Act unconstitutional, noted the myriad of impacts from several different phases of UNGD. In particular, the Supreme Court noted that insofar as the Oil and Gas Act permitted fracking operations in every zoning district throughout the Commonwealth, fracking operations expose otherwise protected areas to environmental and habitability costs including "air, water, and soil pollution; persistent noise, lighting and heavy vehicle traffic; and the building of facilities incongruous with the surrounding landscape." Robinson II, 83 A.3d at 979. The Supreme Court further noted that "the exploitation of the Marcellus Shale Formation will produce a detrimental effect on the environment, on the people, their children, and future generations, and potentially on the public purse, perhaps rivaling the environmental effects of coal extraction." Id. at 976.

Protect PT also cites Section 603(b)(2) of the MPC, which states that zoning ordinances may permit, prohibit, regulate, restrict and determine "[s]ize, height, bulk, location, erection, construction, repair, maintenance, alteration, razing, removal and use of structures." 53 P.S. §10603(b)(2). Thus, Protect PT asserts the MPC itself contemplated consideration of gas wells, tanks, drill rigs and other equipment on a well pad associated with the drilling and completion process.

Protect PT then summarizes a description offered by its expert, Dr. Ingraffea, of the various activities and impacts occurring during various phases of exploration, excavation and construction, drilling, fracking (completion), leading to the production phase. The drilling and fracking phases are particularly harmful, involving the use of heavy equipment, including drilling rigs, which operate 24 hours per day/7days per week and use large volumes of water mixed with chemicals and drilling mud. During the fracking/completion phase, which is extremely dirty, a well is stimulated, or brought into production, by injecting a massive amount of water mixed with chemicals (fracturing fluid) down a well bore to hydraulically fracture the rock in order to widen natural joints making it easier for the hydrocarbons to flow back up the well.

Moreover, Protect PT claims that 20% of the fracturing fluid injected into a well flows back up the well and is treated as residual waste. This waste is transported by truck, requiring hundreds or thousands of trips. As discussed above, the drilling and fracking phases may be repeated over and over again, depending on geology and the operator's leasing agreements. Consequently, Protect PT argues that the trial court erred and abused its discretion in concluding that the drilling and

28

fracking phases are mere construction phases that should not be taken into account in analyzing the Zoning Ordinance in a validity challenge.

### b. Heavy Industrial Activity; Weight of the Expert Evidence

Protect PT next contends the trial court erred or abused its discretion by failing to find UNGD is a heavy industrial activity that causes significant adverse impacts to air and water quality, community development, human-induced seismicity, and climate change, including animal health.  Protect PT notes that the trial court declined to adopt the opinions of its experts, Dr. Ingraffea and Dr. Ketyer, who testified regarding the adverse impacts to human health caused by UNGD. Rather, the trial court credited the testimony of Huntley's expert, Dr. Long, who opined that exposure to air pollutants from UNGD is not a public health concern.

Nevertheless, Protect PT argues that the weight of the evidence introduced at trial suggests that UNGD produces harmful impacts on the health of persons living in proximity to UNGD.  Protect PT cites Dr. Ketyer's testimony that UNGD generates toxic air pollution and increases stressors that impact health such as odors, noise, bright lights, and heavy truck traffic.  Public health studies show that people living in proximity to shale development report adverse health effects including respiratory symptoms, increased fatigue, severe headaches, depression, dizziness, nausea, memory problems, skin irritation and sleep disturbances.

Protect PT further asserts many of the studies Huntley's witness, Dr. Long, relied upon suffered from significant deficiencies or simply do not support his conclusions.  Conversely, Protect PT's witness, Dr. Ketyer, pointed to a study where

researchers found that chemicals associated with oil and gas development pose serious health risks to women and their babies during pregnancy. Rather than weighing Dr. Ketyer's testimony against the conclusory statements of Dr. Long, Protect PT asserts the trial court improperly chose to dismiss Dr. Ketyer's testimony in its entirety.

### c. Township Residents' Testimony

Protect PT also contends the trial court failed to consider the testimony of Township residents who are directly affected by UNGD. Although UNGD only recently began in the Township, Protect PT received noise complaints regarding the Poseidon well. Tracey Mason, who lives less than a mile from the Quest well pad, testified that drilling noise and light from the site greatly impacted her townhouse and prevented her from sleeping. Mason provided a video that depicted flaring at the Quest well site. She recalled that this process sounded like a jet airplane over her house. Mason also testified regarding a spill of mercaptan, a foul-smelling chemical compound added to natural gas to detect leaks, at the Quest well site.

Danielle LeJeune, another Township resident and Protect PT member, also testified regarding her first-hand experience with UNGD. LeJeune, who frequently drove by the Quest well site during the drilling and fracking phases, noted the well site was brightly lit during drilling and very noisy. LeJeune testified that two well pads have been proposed for a site located very close to her home. LeJeune further testified that she and her family are looking to move out of the area to avoid the risks to their health and safety.

30

In light of this testimony, Protect PT argues the trial court, in determining UNGD is not a heavy industrial activity, abused its discretion by failing to weigh or consider the direct experience of Township residents.

### d. Expert Land Use Planning Testimony

In addition, Protect PT contends the trial court erred in failing to find UNGD is a heavy industrial activity because the only expert land use testimony presented at the hearing characterized UNGD as heavy industrial land use. Protect PT's expert, Dr. Daniels, cited an article from the Journal of the American Planning Association defining hydraulic fracturing as a heavy industrial land use. Dr. Daniels testified that UNGD is a heavy industrial use.

Protect PT further asserts Justice Baer's concurring opinion in Robinson II supports Dr. Daniels' testimony that UNGD is an industrial land use generally incompatible with other non-industrial uses. It involves the "blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant bright lighting at night, and the potential for life- and property-threatening explosions and gas well blowouts." See Robinson II, 83 A.3d at 1005 (Baer, J., concurring).

Therefore, Protect PT argues that the trial court's failure to credit Dr. Daniels' testimony that UNGD is a heavy industrial activity, constitutes an error of law and an abuse of discretion.

## 2. Analysis

To begin, we recognize that the trial court, as the fact-finder in this case, is the ultimate judge of credibility and resolves all conflicts in the evidence. Frederick. As the fact-finder, the trial court may reject even uncontradicted testimony if it finds that testimony lacking in credibility. Id.

Here, the trial court rejected the testimony of Protect PT's experts, Dr. Ingraffea, Dr. Ketyer and Dr. Daniels, and the lay testimony of Township residents that UNGD is a heavy industrial activity inconsistent with the MEO District's underlying Resource District. Rather, the trial court adopted the opinion of Huntley's expert, Professor Pifer, who testified that a producing UNGD well pad is compatible with the purpose of the Resource District.

Further, we recognized in Frederick that zoning regulates the *use* of the land, not the particulars of development and construction. In other words, a municipality may use its zoning powers to regulate where UNGD takes place. Huntley & Huntley, Inc. v. Borough Council of the Borough of Oakmont, 964 A.2d 855 (Pa. 2009); Frederick. However, a municipality does not regulate how UNGD is done. Frederick. Therefore, complaints regarding harm to the environment from UNGD should have been addressed to the state agencies issuing permits for UNGD operations. Id.

Nevertheless, we question whether impacts from pre-production stages of UNGD can never be taken into consideration in a substantive validity challenge. The better jurisprudential articulation is that impacts from any stage can be taken into consideration by the fact-finder in a substantive validity analysis. However, no

32

reversible error is evident here. This is because evidence of stage duration[10] and of modest impacts during long-term production provides a sufficient factual basis upon which to distinguish the temporary industrial-type impacts during the much shorter pre-production stages from the incremental impacts during the majority lifespan of an UNGD well. There is no abuse of discretion in affording less weight to evidence of temporary impacts. See Delaware Riverkeeper (Middlesex) (in substantive validity challenge, fact-finder rejected the testimony of Dr. Daniels, which focused on a temporary period of industrial development, in favor of expert testimony considering entire lifespan of UNGD well pad and post-reclamation period).

More generally, the facts in the present case are analogous to those in Frederick and Delaware Riverkeeper (Middlesex), where this Court rejected similar contentions that an UNGD well could only be permitted in an industrial zoning district. In Frederick, the objectors presented similar testimony that UNGD would have a negative impact on the surrounding community. The fact-finder rejected the objectors' testimony for several reasons, including their lack of knowledge of UNGD operations. In Frederick, we noted that the objectors, without any supporting evidence, presumed that UNGD, by its very nature, adversely affects property rights. However, this Court observed that the evidence showed that existing UNGD wells advanced, rather than impeded, the ability of farmers to continue to use their land for farming. In other words, oil and gas development and agricultural uses have a history of safe and beneficial co-existence in rural communities.

---

[10] The trial court noted Dr. Ingraffea's testimony that the construction phase typically lasts for about 30 days, the drilling phase typically lasts about 2-3 weeks, and the completion phase typically lasts about 10 days. Dr. Ingraffea also admitted that the final production phase constitutes the majority lifespan of a UNGD well. See Tr. Ct., slip op., 11/9/18, at 5.

33

Also, in Frederick, we upheld the fact-finder's determination that the zoning ordinance, which allowed UNGD in every zoning district, did not violate substantive due process. We reached this conclusion because UNGD must satisfy exacting standards designed to protect neighboring property owners from cognizable injury. In short, we reasoned that the objectors' expressed concerns consisted of speculation of possible harms. Such speculation is insufficient to show the proposed UNGD well would be detrimental to the health, safety and welfare of the neighborhood.

Similarly here, the fact-finding trial court held that the Township, in determining that UNGD is a proper use in the MEO District overlaying sparsely populated areas of the Resource District, engaged in lengthy proceedings before enacting the Zoning Ordinance. The question of what best serves the public interest is primarily a question for the appropriate legislative body in a given situation. Plaxton. During these proceedings, the Township carefully and appropriately balanced its obligation to provide for property owners' development and management of minerals with its obligation to protect the health, safety and welfare of neighboring Resource District property owners. Based on our review of the record, we conclude the trial court's determinations are supported by substantial evidence.

## B. Comprehensive Plan; Appropriate Use of Overlay District
### 1. Contentions
#### a. Comprehensive Plan; Residents' Expectations

34

Protect PT argues that UNGD is a new activity in the Township that is incompatible with the Township's Comprehensive Plan and residential land use expectations in the Resource District. It asserts the Commissioners failed to consider the Comprehensive Plan when enacting the MEO District, resulting in UNGD, a heavy industrial activity, being permitted across a majority of the Township. Rather than using available land use planning tools and data to determine the best location for an industrial activity UNGD and tailoring the Zoning Ordinance to local conditions, Protect PT contends the Township enacted a blanket overlay district that permits UNGD to spread out across the Township. Thus, Protect PT maintains the Township's decision to adopt the Zoning Ordinance was devoid of rational planning principles and therefore arbitrary. As such, Protect PT assigns error in the trial court's conclusion that the MEO District fits within the Comprehensive Plan's goals.

In support of its position, Protect PT developed a map identifying six schools, five daycare facilities, various recreational facilities, and a community pool in proximity to existing and proposed UNGD well pads. Protect PT also mapped public water lines and private water supplies in the Township in relation to the MEO District and proposed UNGD well pads. Protect PT maintains that the maps reflect that the MEO District encourages haphazard UNGD in the Resource District.

Protect PT's expert witness, Dr. Daniels, described the Resource District as essentially a rural residential district where agriculture is a permitted use. Protect PT argues the Comprehensive Plan envisions an evolving vibrant suburban community. Dr. Daniels testified the Township's population density of 600 people per square mile is indicative of a suburban community. The Comprehensive Plan

35

provides property owners a sense of how the community is expected to develop over the next 20 years.

In contrast, the Industrial Commerce District provides a place where both heavy and light industrial activities are really a preferred use. Protect PT therefore argues that the MEO District is introducing UNGD, a heavy industrial use, into an area designated for development in the Comprehensive Plan as an evolving suburban community.

Protect PT further argues that in the context of evaluating substantive validity claims related to exclusionary zoning, the reasonable development of minerals is only one of several factors listed in Section 603 of the MPC that should be considered. See Larock v. Bd. of Supervisors of Sugarloaf Twp., 866 A.2d 1208 (Pa. Cmwlth. 2005). Applying an equivalent standard in this case, Protect PT asserts, requires that a court consider how the Zoning Ordinance balances UNGD with the various other factors listed in Section 603, including protection of prime agricultural land, and protection of natural and historic resources. Protect PT argues the trial court's failure to balance these factors in tailoring the MEO District to local conditions is a substantial factor weighing in favor of invalidating the Zoning Ordinance.

Because the MEO District allows UNGD in the non-industrial Resource District, Protect PT asserts the MEO District clearly conflicts with the Township's community development objectives and Comprehensive Plan. Thus,

Protect PT contends the Zoning Ordinance is arbitrary and unconstitutional in that it establishes an irrational zoning framework.

In sum, Protect PT argues that the purpose of zoning is to separate conflicting land uses, to protect the property value and to protect public health, safety and welfare. To fulfill that purpose, a municipality must identify uses that will cause conflicts, often based on factors such as noise, dust, odors, light and pollution. The municipality must then design an ordinance to minimize those conflicts.

Thus, Protect PT asserts the MEO District is an arbitrary zoning district which permits the haphazard development of UNGD, which will lead to land use conflicts with Township residents in the Resource District. As such, Protect PT argues the trial court erred and abused its discretion in concluding that UNGD has a long history in the Township, thereby making it compatible with residential land uses and the Comprehensive Plan.

### b. MEO District Lacks Specific and Targeted Provisions

Protect PT next contends the MEO District is invalid because it does not have specific and targeted provisions tailored to local conditions. Rather, it authorizes industrial development over about 55% of the Township. The MEO authorizes deep mining, surface mining, sand, gravel and limestone excavation, UNGD, conventional drilling and the storage of explosives and other hazardous or toxic materials.

The MEO District inexplicably overlays the Township's most intensive land use district, the IC District and its least intensive land use district, the Resource District. Given the Township's growing suburban population, Protect PT argues it is clear the MEO District was not tailored to local conditions. Rather, it blankets the IC and Resource Districts without any consideration for where it would be appropriate to locate UNGD. The purpose of an overlay district is to create specific provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning ordinance. Protect PT contends that the IC District is the only location where UNGD is allowed in a manner sufficiently protective of a citizen's substantive due process rights.

In other words, the MEO District creates an industrial zone out of the Resource District, significantly changing the expectations of property owners in the Resource District. Citing Main Street and Robinson II, Protect PT argues the MEO's disruption of expectations created by the underlying Resource District violates both substantive due process principles and the standards for an appropriate overlay district.

Protect PT argues the purpose of the Resource District is to provide land for continuing agricultural operations, resource management, timber harvesting, outdoor recreation, and low density single-family residential development. Ord. §190-402(A). The testimony at the hearing established that UNGD is a heavy industrial activity incompatible with the main purposes identified in the Resource District.

The MEO District is arbitrary because its purpose is to provide for the extraction of minerals where the population density is low and significant development is not projected for the near future.  See Ord. §190-407(A).  Protect PT claims the Township, which is a growing residential community, failed to establish where that growth is taking place, or where it is expected to occur in the future.  Because the MEO District allows for UNGD to occur in the Resource District without any consideration of the long-term impact on neighboring residential properties, it is arbitrary.  Therefore, Protect PT urges, the trial court's conclusions to the contrary must be reversed.

## 2. Analysis

First and foremost, in accord with Section 303(c) of the MPC, no action by the governing body of a municipality shall be invalid or be subject to challenge on appeal on the basis that such action is inconsistent with, or fails to comply with the provisions of a comprehensive plan.  53 P.S. §10303(c); Springwood Dev. Partners, L.P. v. Bd. of Supervisors of N. Cornwall Twp., 985 A.2d 298 (Pa. Cmwlth. 2009) (failure to conform to requirements of comprehensive plan does not invalidate a zoning amendment); Todrin v. Bd. of Supervisors of Charlestown Twp., 367 A.2d 332 (Pa. Cmwlth. 1976) (holding that governing body is not even bound by formally adopted comprehensive plan).

Further, the trial court credited Huntley's expert, Professor Pifer, that oil and gas development has more than a 100-year history in Westmoreland County.  See Frederick (fact-finder accepted similar testimony by Professor Pifer).  In addition, as discussed above, previous Township zoning ordinances offered much

39

less regulation of oil and gas development than does the current Zoning Ordinance. In particular, the 1995 zoning ordinance authorized oil and gas drilling throughout the Township as a special exception with very few other requirements. In contrast, the Zoning Ordinance limits oil and gas drilling to the MEO District.

Notably, the Resource District primarily addresses resource management, not residential development. In addition, the MEO District does not blanket the Resource District. Rather, the MEO District specifically excludes areas of dense residential and commercial activity. The MEO District also increases some of the state-imposed setbacks. As a result of the increased setbacks, UNGD is limited to less than 10% of the Township.

The purpose of an overlay district is to craft provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning district. Main St. The MEO District meets those objectives by providing for the preservation of agricultural operations and development opportunities for owners of mineral resources. In creating the MEO District, the Township properly balanced the rights of property owners seeking to develop their mineral resources with the need to ensure the health, safety and welfare of neighboring community members and property owners.

Furthermore, in the MEO District, 77.9% of the land is under oil and gas leases. In Gorsline II, our Supreme Court determined that municipalities are empowered to permit oil and gas development in any or all of its zoning districts. The Gorsline II Court, rather than relegating UNGD solely to industrial zones,

40

instead noted that its decision should *not* be misconstrued as an indication that UNGD was fundamentally incompatible with agricultural and residential zoning districts. As discussed above, in <u>Frederick</u> we upheld the ZHB's determination that the objectors failed to prove that the zoning ordinance (which allowed UNGD in every zoning district) violated substantive due process. Regardless of the zoning district, we observed in <u>Frederick</u> that UNGD must satisfy exacting standards designed to protect neighboring property owners from cognizable injury.

Here, unlike <u>Frederick</u>, UNGD is permitted only in the MEO District, and only by special exception. As noted above, the trial court determined that UNGD is compatible with, and even beneficial to, the rural uses permitted in the Resource District. Although low-density residential properties are permitted in the Resource District, resource development uses are also permitted. Protect PT failed to present any credible evidence indicating UNGD would be harmful to the health, safety or welfare of properties neighboring UNGD operations.

Finally, our independent review of the 2005 Comprehensive Plan reveals concrete ways in which the process and result of the Zoning Ordinance are fundamentally compatible with the Plan. First, the Comprehensive Plan recommends more flexibility in regulating land use and land development. R.R. at 989a (addressing current and future land use). Among identified flexible zoning techniques is the adoption of additional overlay zones. <u>Id.</u> Second, the Comprehensive Plan observes that future land use planning will be more likely to succeed if based upon broad consensus and citizen vision. <u>Id.</u> The extensive development process for the Zoning Ordinance is relevant in this regard. Third, the

41

Comprehensive Plan specifically calls for consideration of a "Rural Resource Area" providing for extractive industries, among other uses. R.R. at 995a (addressing implementation goals to limit the impact of development on the natural environment). Notably, the Comprehensive Plan contains a map of then-existing gas and oil well locations. R.R. at 1046a.

Considering the foregoing, we reject Protect PT's contention that the MEO District is invalid because it is inconsistent with the Comprehensive Plan or Resource District residents' reasonable expectations. The Resource District clearly provides for resource development. We also reject Protect PT's erroneous contention that the MEO District is invalid because it does not have specific and targeted provisions tailored to local conditions. To the contrary, the MEO District excludes densely populated areas. Further, Analyst Gehringer, Huntley's expert, credibly testified that the Zoning Ordinance imposes 600-foot setbacks from protected structures and 200-foot setbacks from property lines, thereby limiting UNGD to less than 10% of the Township. See N.T., 6/5/18, at 868-70, R.R. at 728a.

## C. ERA

### 1. Contentions

Protect PT next contends the Zoning Ordinance and the trial court's decision fail to protect Township residents' right to use, enjoy and protect their property under Article I, Sections 1 and 2 of the Pennsylvania Constitution,[11] and their right to a healthy environment under the ERA.

---

[11] Pursuant to Article I, Sections 1 and 2 of the Pennsylvania Constitution, all citizens of the Commonwealth enjoy the right to use, enjoy and protect their property. PA. CONST. art. I, §§1, 2.

Citing PEDF and Robinson II, Protect PT argues that under the language of the ERA, all government actors are trustees of the public's natural resources and are required to conserve and maintain those resources for the benefit of all people. Protect PT also cites The Delaware Riverkeeper Network v. Department of Environmental Protection & R.E. Gas Development, LLC (EHB Dkt. Nos. 2014-142-B, 2015-157-B, filed May 11, 2018), 2018 WL 2294492, a decision of the Pennsylvania Environmental Hearing Board (EHB). In that case, the EHB articulated a two-step process for determining compliance with the ERA. The first step involves an evaluation of whether the environmental impacts of the action were considered and whether there was a correct determination that the action would not result in unreasonable degradation, diminution, depletion or deterioration of the environment. The second step involves an evaluation of whether the government entity fulfilled its responsibilities as a trustee under the ERA by acting with prudence, loyalty, and impartiality with respect to the beneficiaries of the natural resources impacted by the action.

Protect PT asserts that although the Township held many meetings prior to enacting the Zoning Ordinance, there is no evidence in the record that the Township actually identified or evaluated the environmental impacts of its decision-making in creating the MEO District. Thus, Protect PT argues the Township, when it enacted the MEO District, failed to consider the environmental impacts of its decision.

Further, rather than acting with prudence, loyalty and impartiality on behalf of its citizens, Protect PT asserts the Township succumbed to the pressure of

the very outside interests looking to conduct UNGD in the Township.  In particular,

Protect PT alleges the Township settled a $300 million lawsuit brought against it by

Intervenor Apex by imposing industry-preferred standards in the Zoning Ordinance.

Protect PT thus maintains the Township's enactment of the MEO District violates

the ERA and will result in unreasonable environmental degradation in the Township.


## 2. Analysis

Section 190-641(D) of the Zoning Ordinance, specifically relating to a

UNGD applicant's obligation to comply with the ERA, provides:

> The applicant shall demonstrate that the drill site operations will not violate the citizens of Penn Township's right to clean air and pure water as set forth in [Article I, Section 27] of the Pennsylvania Constitution (the Environmental Rights Amendment).  The applicant shall have the burden to demonstrate that its operations will not affect the health, safety and welfare of the citizens of Penn Township or any other potentially affected land owner.  The application submitted shall include reports from qualified Environmental individuals attesting that the proposed location will not negatively impact the Township residents' Environmental Rights; and will include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.

Ord. §190-641(D); R.R. at 918a  (emphasis added).


As reflected by Section 190-641(D) of the Zoning Ordinance, the

Township did consider its residents' rights under the ERA.  Contrary to Protect PT's

contention that the Township's settlement imposed industry-preferred standards in

the Zoning Ordinance, a realistic assessment of the consent judgment indicates that

the settlement did not contravene the Zoning Ordinance.  Rather, it actually provides for additional controls on UNGD operations.  See R.R. at 1265a-91a.

In Frederick, we reviewed a similar situation elsewhere in Westmoreland County where the objectors argued that the zoning ordinance violated the ERA by placing UNGD, an alleged industrial use, in agricultural areas.  The objectors maintained that the UNGD well would degrade the local environment in which people live, work and recreate, including the public natural resources on which people rely.

The objectors in Frederick advanced arguments nearly identical to those raised here.  In rejecting these arguments, the fact-finder in Frederick relied on Professor Pifer's testimony that oil and gas development safely coexisted with agricultural uses in the rural areas of the township.  We noted in Frederick that the ERA does not call for a stagnant landscape or a derailment of economic development.

By failing to show with credible evidence that UNGD would adversely affect neighboring property owners in the Resource District, Protect PT failed to establish that the Zoning Ordinance "unreasonably impairs" the rights of Township residents under the ERA.  See Frederick, 196 A.3d at 697 (emphasis added).

Further, the plurality in Robinson II stated that the ERA does not impose express duties on municipalities to enact specific affirmative measures to promote clean air, pure water and the preservation of different values of our

45

environment. As we recognized in Frederick, municipalities lack the authority to replicate the environmental oversight that the General Assembly conferred upon DEP and other state agencies. The preemption language in Section 3302 of the Oil and Gas Act, left intact after Robinson II, specifically states that a municipality lacks the authority to regulate how gas wells operate. 58 Pa. C.S. §3302; Frederick. Rather, a zoning ordinance must balance the public interests of the community with the due process rights of private property owners. Frederick.

Additionally, the Zoning Ordinance is more stringent than the zoning ordinance in Frederick. See Tr. Ct., slip op. at 25-27. In particular, Section 190-641(D) of the Zoning Ordinance mandates that an UNGD application shall include reports from qualified environmental individuals attesting that the proposed development will not negatively impact the Township residents' ERA rights. Ord. §190-641(D). Consequently, our decision in Frederick is equally applicable here.

In sum, the trial court did not err or abuse its discretion by failing to find that the Zoning Ordinance violated Township residents' rights under the ERA. Frederick; Delaware Riverkeeper (Middlesex).

### D. Substantive Due Process

### 1. Contentions

With respect to its substantive validity challenge, Protect PT argues it met its burden of showing that the Zoning Ordinance is arbitrary and unreasonable and bears no substantial relationship to promoting the public health, safety and welfare. Relying on Dr. Daniels' testimony, Protect PT asserts it established that the

location of the proposed well pads in the MEO District overlay of the Resource District is scattered and haphazard. Protect PT further claims the Township failed to identify specific and targeted areas where UNGD would be compatible with similar uses and failed to balance neighboring property owners' reasonable expectations and constitutional rights.

Citing Gorsline II, Protect PT contends that in this case, the Township failed to tailor the Zoning Ordinance to local conditions in the Resource District and instead utilized a blanket overlay district that effectively permits UNGD throughout a majority of the Township's residential areas without any consideration for the adverse impacts that this heavy industrial activity would have on neighboring property owners. Protect PT argues that placing heavy industrial uses in clearly non-industrial areas violates residents' substantive due process rights and rights under the ERA.

## 2. Analysis

As we noted in Frederick, a substantive due process analysis requires a balancing of the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights. Here, Protect PT essentially relies upon expert testimony rejected by the fact-finder. As discussed above, the trial court fully explained its reasons for its determination that UNGD will not adversely affect the health, safety or welfare of neighboring property owners in the MEO District. As a result, Protect PT failed to satisfy its heavy evidentiary burden of proof in a substantive validity challenge. Frederick.

Similar to the fact-finder in Frederick, the trial court here recognized that natural gas extraction operations were historically commonplace in the Township. Conventional wells are a principal permitted use in the Resource District. See R.R. at 835a. UNGD wells are permitted as a special exception only in the MEO District and are subject to seven pages of various restrictions. See Ord. §§190-407 (R.R. at 850a-53a), 190-641 (R.R. at 915a-18a).

In short, the Zoning Ordinance properly balances the rights of citizens to benefit economically from UNGD, which helps them sustain their agricultural-based livelihoods, with the interests of the general public by adopting an extensive regulatory scheme far beyond that imposed on any other use. The Zoning Ordinance addresses issues such as minimum lot size, required yards, setbacks, wastewater, health and safety, access routes, erosion and sediment control, security, site reclamation, road use, and compliance with the ERA. Also, because the Zoning Ordinance regulates UNGD as a special exception, the Township can impose additional conditions.

As discussed above, Protect PT failed to establish that UNGD posed any substantial actual risk to the environment or health of Township residents. To the contrary, the trial court accepted testimony from Huntley's expert, Professor Pifer, that UNGD is compatible with the rural and agricultural uses in the Resource District. Consequently, the trial court properly determined that the Zoning Ordinance, and in particular, the MEO District, which permits UNGD in specific and targeted areas of the Resource District that are rural and not densely populated, did not violate substantive due process. Frederick.

## IV. Conclusion

Discerning no error, abuse of discretion or constitutional violations in the trial court's opinion and order, we affirm.

_____
ROBERT SIMPSON, Senior Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                                  :
                        Appellant            :
                                             :
              v.                             :   No. 1632 C.D. 2018
                                             :
Penn Township Zoning Hearing Board           :
                                             :
              v.                             :
                                             :
Olympus Energy LLC,                          :
Apex Energy (PA), LLC, and                   :
The Township of Penn                         :

# **O R D E R**

      **AND NOW**, this 14th day of November 2019, for the reasons stated in the foregoing opinion, the order of the Court of Common Pleas of Westmoreland County is **AFFIRMED**.

 

 

_____
ROBERT SIMPSON, Senior Judge